UNITED STATES v. BOLLES et al.

(District Court, W. D. Missouri. November 10, 1913.)

1. INDICTMENT AND INFORMATION (§ 10*)—FINDING OF GRAND JURY—EVIDENCE TO JUSTIFY.

To warrant the return of an indictment, it should be based on competent legal evidence such as is legitimate and proper before a petit jury.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 50–61; Dec. Dig. § 10.*]

2. GRAND JURY (§ 36*)—PROCEDURE—EVIDENCE IN BEHALF OF ACCUSED.

A person whose acts are under investigation by a grand jury has no right to himself appear and testify before such jury or to present evidence in his behalf either oral or written.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. §§ 75–78; Dec. Dig. § 36.*]

Petition by Richard J. Bolles and others for an order directing the grand jury to allow petitioners and certain witnesses named to testify before that body, and directing it to consider certain documents. Petition denied.

Edward J. White, J. G. L. Harvey, and H. S. Hadley, all of Kansas City, Mo., for petitioners.

S. R. Rush, Sp. Asst. Atty. Gen., and Francis M. Wilson, U. S. Atty., of Platte City, Mo., opposed.

YOUMANS, District Judge. R. J. Bolles, A. D. Hart, John Matthews, George A. Paddock, R. J. Martin, and Joseph H. Borders have filed a petition reciting the following facts:

1. The purchase in 1908 by Richard J. Bolles from the state of Florida of 500,000 acres of land known as Everglade lands, in Palm Beach and Dade counties in that state, the state of Florida agreeing that it would drain said land in accordance with the condition of the grant of said land to said state by the United States.

2. That during the year 1909 said Bolles, with John Matthews, A. D. Hart, and H. R. Ray, organized, under the laws of Colorado, the Florida Fruit Lands Company, which purchased from Bolles 180,000 acres of said land.

3. That during the year 1909 the Florida Fruit Lands Company entered into a contract with R. J. Martin and Joseph H. Borders for the sale of 180,000 acres of land, and that thereafter the sale of said land was conducted by Martin and Borders, as agents of the Florida

Fruit Lands Company, and that certain literature was used in further-ance of the sale thereof; the representations contained therein being based upon written and oral representations to the officers of said company and Martin and Borders, by the state officials of the state of Florida, the official reports of the said state, and the reports and publications of the United States Department of Agriculture.

4. That upon said representations said lands were sold to about. 12,000 purchasers, as tenants in common, and that pursuant to the terms of their contract of purchase, after the purchase price had been fully paid, said lands were conveyed by the Florida Fruit Lands Company to Joseph H. Borders, Claude E. Sawyer, and Fred L. Hoag, as trustees for said purchasers, in order that the lands might be divided among them.

5. That prior to the beginning of the sale of said land the contract for the sale and the plan of dividing the same were submitted to and received the approval of the Assistant Attorney General of the Post Office Department of the United States. That the deed was delivered by the Florida Fruit Lands Company to said trustees on March 15, 1911, and the lands were divided among the purchasers on that day.

6. The petitioners state that they are advised that the grand jury now in session is investigating the question of whether in the sale of said lands there has been any violation of any of the laws of the United States in the Western division in the Western district of Missouri.

7. The petitioners allege that in making the sale and distribution of said lands they have not violated any of the laws of the United States, and request that certain instructions be given to the grand jury, "to summon certain witnesses and examine certain documents before finally deciding whether indictments shall be returned."

8. The following persons are designated as the witnesses referred to: F. C. Elliott, present chief engineer of the trustees of the internal improvement fund of the state of Florida; Albert W. Gilchrist, for-mer Governor of Florida; Gov. Trammel, present Governor of Flor-ida and Attorney General of the state at the time said lands were sold; W. H. Ellis, former Attorney General of the state, now attorney for the trustees of said internal improvement fund; William O'Brien, attorney for the Florida Fruit Lands Company; and George L. Da-vis, who represented said company in certain civil litigations.

The books, papers, and documents desired are Senate Document 87; report of William R. Harr, Assistant Attorney General; applica-tion for the purchase of the land; deed of the Florida Fruit Lands Company to the trustees; Act of Congress of September 28, 1850, c. 84, 9 Stat. 519; Act of the Legislature of Florida accepting grant, passed in 1855; Acts of Florida of 1881, chapter 3326; General Stat-utes of Florida 1906, sections 620–628; decision of the Supreme Court of Florida in the case of Trustees of the Internal Improvement Fund v. Root, 63 Fla. 686, 58 South. 371; deed from the state of Florida to Richard J. Bolles; transcript of evidence of Joseph H. Rodes in the civil suit recently tried in the circuit court of Jackson county, Mo.

Petitioners further request that they be permitted to appear and

testify under oath before the grand jury; they waiving all rights, privileges, and immunities.

. The petition closes with the following paragraph:

"Said petitioners in submitting this request urge upon the consideration of this honorable court that they are entitled, as citizens of the United States who have never heretofore been charged or convicted of any violation of its laws or the laws of any state, to the full and complete investigation by the present grand jury of the charges presented against them, and that they have as much right as citizens of the United States to enjoy immunity from indictment, if not guilty, as they have the right to enjoy immunity from conviction, if not guilty; that the chief law officer of the United States, the Attorney General, has once fully heard and investigated the matter now being investigated by this grand jury and decided that there was no basis or warrant for indictment or investigation; and that petitioners are entitled to the benefit of said decision, at least to the extent of being permitted to present their side of this controversy for the consideration of this grand jury."

To this petition the special assistant to the Attorney General and the United States attorney have filed a response, wherein they declare their intention to submit to the grand jury every document, act of Congress, act of Legislature of Florida referred to in the petition with the exception of the following:

(1) Report of William R. Harr, Assistant Attorney General.

(2) Transcript of evidence of Joseph H. Rodes in a certain civil suit tried in the circuit court of Jackson county, Mo.

In regard to the persons named in the petition, the response states that F. C. Elliott has been subpœnaed to appear before the grand jury, and that his testimony will be submitted; J. C. Wright was subpœnaed, and on his request was permitted to return home subject to call on telegram; William O'Brien has been subpœnaed and will appear and testify; Albert W. Gilchrist, Gov. Trammel, W. H. Ellis, and George L. Davis have been subpœnaed. The response also states that it is not the purpose of the prosecuting officers to admit the petitioners to testify.

The issue is narrowed to the following points:

(1) The introduction of the report of the Assistant Attorney General, Harr.

(2) The introduction of the transcript of the evidence of Joseph H. Rodes.

(3) The admission of petitioners and certain witnesses on their behalf.

[1] To warrant the return of an indictment it should be based on competent legal evidence, such as is legitimate and proper before a petit jury. 20 Cyc. 1346; U. S. v. Kilpatrick (D. C.) 16 Fed. 765; U. S. v. Reed, Fed. Cas. No. 16,134.

The report of the Assistant Attorney General would not be competent legal evidence in a trial upon an indictment charging use of the mails in execution of a scheme to defraud, nor upon a charge of the use of the mails in carrying out a lottery scheme. Harrison v. United States (C. C. A.) 200 Fed. 673. It would not therefore be proper to submit it to the grand jury.

With regard to the transcript of evidence of Rodes, it is claimed in the argument that it will contradict, or tend to contradict, any evidence

he may give before the grand jury tending to sustain the charge against petitioners.

It is presumed that every witness will tell the truth. Every trial jury is so instructed. The law cannot be administered on any other theory. The contradiction of a witness by statements differing from those made by him on the stand is a form of impeachment. Impeachment involves the trial of a collateral matter; that is, the credibility of the particular witness. The machinery of the grand jury is not adapted to that character of inquiry. In this case it would require the investigation of the issues involved in the civil suit, competency and admissibility of the alleged contradictory statements, which are questions for the court, and the effect of such contradictory statements, which is a question for a trial jury.

[2] The basis of the claim of petitioners for the order prayed for is shown in the paragraph above quoted. They allege:

"That they have as much right, as citizens, to enjoy immunity from indictment, if not guilty, as they have a right to enjoy immunity from conviction, if not guilty."

As a necessary conclusion, they allege that they have the right "to present their side of this controversy for the consideration of this grand jury." The effect of this contention, if sustained, is to make the function of the grand jury identical with that of a trial jury. It was urged in argument that the claims above stated follow from a more liberal modern view of the powers and duties of a grand jury. The place that the grand jury occupies in the administration of the criminal law of this country, and the extent of the field of its inquiries, are readily ascertained and defined. The statement made by Blackstone, who died in 1780, of the procedure before a grand jury, may be taken as a correct view of the procedure as it existed in his time, and as it came to us. In Book 4, at page 302 of his Commentaries, he says:

"This grand jury are previously instructed in the articles of their inquiry by a charge from the judge who presides upon the bench. Then they withdraw to sit and receive indictments, which are preferred to them in the name of the King, but at the suit of any private prosecutor; and they are only to hear evidence on behalf of the prosecution; for the finding of an indictment is only in the nature of an inquiry or accusation which is afterwards to be tried and determined; and the grand jury are only to inquire upon their oaths whether there be sufficient cause to call upon a party to answer it. A grand jury, however, ought to be thoroughly persuaded of the truth of an indictment, so far as their evidence goes; and not to rest satisfied merely with remote probabilities; a doctrine that might be applied to very oppressive purposes."

There is reported in Respublica v. Shaffer, 1 Dallas, 236, 1 L. Ed. 116, a ruling of Chief Justice McKean of the court of oyer and terminer at Philadelphia on a similar request to the one contained in this petition. It occurred during the year 1788, and the occasion for the ruling is set out in that report as follows:

"After some conversation with the grand inquest, the Attorney General informed the court that a list of eleven persons had been presented to him by the foreman, with a request that they might be qualified and sent to the jury, as witnesses upon a bill then depending before them. He stated that the list

had been made out by the defendant's bail; that the persons named were intended to furnish testimony in favor of the party charged, upon facts with which the inquest, of their own knowledge, were unacquainted; and he concluded with requesting that the opinion of the court might be given upon this application."

To the inquiry the Chief Justice replied as follows:

"Were the proposed examination of witnesses, on the part of the defendant, to be allowed, the long-established rules of law and justice would be at an end. It is a matter well known, and well understood, that by the laws of our country every question which affects a man's life, reputation, or property must be tried by twelve of his peers; and that their unanimous verdict is, alone, competent to determine the fact in issue. If, then, you undertake to inquire, not only upon what foundation the charge is made, but, likewise, upon what foundation it is denied, you will, in effect, usurp the jurisdiction of the petit jury, you will supersede the legal authority of the court, in judging of the competency and admissibility of witnesses, and, having thus undertaken to try the question, that question may be determined by a bare majority, or by a much greater number of your body, than the twelve peers prescribed by the law of the land. This point had, I believe, excited some doubts upon former occasions; but those doubts have never arisen in the mind of any lawyer, and they may easily be removed by a proper consideration of the subject. For the bills or presentments, found by a grand jury, amount to nothing more than an official accusation, in order to put the party accused upon his trial; until the bill is returned, there is therefore no charge from which he can be required to exculpate himself; and we know that many persons, against whom bills were returned, have been afterwards acquitted by a verdict of their country. Here, then, is the just line of discrimination: It is the duty of the grand jury to inquire into the nature and probable grounds of the charge; but it is the exclusive province of the petit jury to hear and determine, with the assistance and under the direction of the court, upon points of law, whether the defendant is or is not guilty, on the whole evidence, for as well as against him. You will therefore readily perceive that, if you examine the witnesses on both sides, you do not confine your consideration to the probable grounds of charge, but engage completely in the trial of the cause; and your return must, consequently, be tantamount to a verdict of acquittal or condemnation. But this would involve us in another difficulty; for by the law it is declared that no man shall be twice put in jeopardy for the same offense; and yet it is certain that the inquiry now proposed by the grand jury would necessarily introduce the oppression of a double trial. Nor is it merely upon maxims of law, but, I think, likewise, upon principles of humanity, that this innovation should be opposed. Considering the bill as an accusation grounded entirely upon the testimony in support of the prosecution, the petit jury receives no bias from the sanction which the indorsement of the grand jury has conferred upon it. But, on the other hand, would it not in some degree prejudice the most upright mind against the defendant, that on a full hearing of his defense, another tribunal had pronounced it insufficient which would then be the natural inference from every true bill. Upon the whole, the court is of opinion that it would be improper and illegal to examine the witnesses, on behalf of the defendant, while the charge against him lies before the grand jury."

Amendment No. 5 of the Constitution of the United States was adopted in 1791. The part of it which applies to grand juries reads as follows:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger."

It is safe to conclude that this amendment was adopted with the same idea as to the power of, and procedure before, the grand jury

as stated by Blackstone and Chief Justice McKean. The question now arises: What change has been made since that time? There has been no change made by statute. It is then necessary to ascertain whether a change has been made through judicial construction or decision.

In 1810, in the Circuit Court for the District of Columbia, the statement was made to the court that witnesses were about to be sent to the grand jury on the part of the United States against one Palmer, charged with perjury, and on his behalf the motion was made for leave to send up witnesses to the grand jury on the part of Palmer. The motion was refused by the court. U. S. v. Palmer, 27 Fed. Cas. No. 15,989, p. 410.

In 1835, in the Circuit Court for the District of Columbia, the grand jury submitted to the court the following question:

"The grand jury beg leave to represent to the honorable court that Doctors Cousine, Bohrer, Sewall, and Clark were directed to be summoned to testify in the case of Richard Lawrence (who attempted to shoot the President of the United States), to prove the sanity or insanity of the accused. The district attorney has told the jury that the examination of these witnesses for that purpose is improper. The jury therefore ask the opinion and instructions of the court upon this point."

After quoting from Chitty, vol. 1, p. 318, and citing the opinion of Chief Justice McKean, 1 Dall. 236, 1 L. Ed. 116, the court said:

"In regard to the question of law submitted to this court by the grand jury, the court instructs them that if, in any case before them, they shall be satisfied by the evidence adduced on the part of the prosecution that the party accused committed the unlawful act with which he is charged, they have no right to send for and examine witnesses to prove mere matter of justification or excuse. If such a course would be permitted, it would require the United States to produce other witnesses either to discredit those thus produced on the part of the defendant or to disprove the fact about which they are called to testify, and thus the whole trial of the case would be drawn before the grand jury, out of the presence of the court and the counsel of the parties."

In 1836, Chief Justice Taney, sitting as Circuit Justice in the Circuit Court for the District of Maryland, in charging a grand jury, said:

"But, in our desire to bring the guilty to punishment, we must still take care to guard the innocent from injury; and every one is deemed to be innocent, until the contrary appears by sufficient legal proof. You will therefore, in every case that may come before you, carefully weigh the testimony, and present no one, unless, in your deliberate judgment, the evidence before you is sufficient, in the absence of any other proof, to justify the conviction of the party accused. And this rule is the more proper, because he is not permitted to summon witnesses or adduce testimony to the grand jury, and your decision must be made without hearing his defense." Charge to Grand Jury, 30 Fed. Cas. No. 18,257, p. 998.

In 1861, United States District Judge Leavitt, in charging a grand jury in the Southern District of Ohio, said:

"But in regard to treason, and indeed all other crimes, the jury should reach a rational conclusion, from the law and the evidence, that the person accused is guilty, before returning a true bill against him. A grand jury has only the evidence which the government can adduce, without reference to what the defendant may have it in his power to bring forward, in proof of his innocence." Charge to Grand Jury, 30 Fed. Cas. No. 18,272, p. 1038.

In 1867, United States District Judge Shipman, in the District of Connecticut, in charging the grand jury said:

"In order to find a true bill against any person, the proof should be such as, in your judgment, would warrant a petit jury in pronouncing the accused guilty. You proceed upon the evidence furnished you by the government, leaving the alleged offender to meet the charge, before the petit jury, by such proof as he may command." Charge to Grand Jury, 30 Fed. Cas. No. 18,246, p. 976.

In the same year United States District Judge Erskine, in passing on a challenge to a grand jury in the Southern District of Georgia, said:

"The challenger states in his affidavit that the district attorney distinctly promised him that he should be permitted on the trial before the grand jury to have evidence in his defense laid before them. No such promise or agreement can have the sanction of this court. To allow evidence, either oral or written, to go before the grand inquest, on behalf of a defendant, would be subversive of the ancient and well-settled rules of courts of justice." U. S. v. Blodgett, 30 Fed. Cas. No. 18,312, p. 1158.

In 1869, United States District Judge Deady, in charging a grand jury in the District of Oregon, said:

"In respect to the manner and extent of your inquiries, your own good sense will be your best guide. You ought only to act upon legal evidence or what satisfies you that the legal evidence exists. The party accused, or concerning whom an inquiry is made, has no right to be heard before you, and you should not allow him in the jury room, or to be examined as a witness in his own behalf." Charge to Grand Jury, 30 Fed. Cas. No. 18,251. p. 986.

In the same year United States District Judge Benedict, in charging a grand jury in the Southern District of New York, said:

"It is not your province to try the cases which you may consider. That duty devolves upon the petit jury and the courts; but you are diligently to inquire and true presentment make of every offense arising under the laws of the United States which shall be made to appear by reasonable prima facie proof." Charge to Grand Jury, 30 Fed. Cas. No. 18,247, p. 978.

It will be seen from the foregoing authorities that, from the adoption of amendment No. 5 to the year 1869, it was the practice of the federal courts to exclude from the grand jury the parties charged and witnesses on their behalf.

It is urged in the argument on this petition that a change was made by Justice Field in a charge made by him to a grand jury, while sitting as Circuit Justice in the District of California in the year 1872, which charge is reported in 30 Fed. Cas. No. 18,255, at page 992. The portion of the charge relied upon is as follows:

"In your investigations you will receive only legal evidence, to the exclusion of mere reports, suspicions, and hearsay evidence. Subject to this qualification, you will receive all the evidence presented which may throw light upon the matter under consideration, whether it tend to establish the innocence or the guilt of the accused. If, in the course of your inquiries, you have reason to believe that there is other evidence, not presented to you, within your reach, which would qualify or explain away the charge under investigation, it will be your duty to order such evidence to be produced. Formerly, it was held that an indictment might be found if evidence were produced sufficient to render the truth of the charge probable. But a different and a more just and merciful rule now prevails. To justify the finding of an indictment, you must be convinced, so far as the evidence before you goes, that the accused is

guilty; in other words, you ought not to find an indictment, unless in your judgment, the evidence before you, unexplained and uncontradicted, would warrant a conviction by a petit jury."

Justice Field did not, by this declaration, intend to overturn the practice of almost 100 years. In the same instruction he gave an account of the development of the grand jury and the office it performed in this country. He said:

"The institution of the grand jury is of very ancient origin in the history of England; it goes back many centuries. For a long period its powers were not clearly defined; and it would seem from the accounts of the commentators on the laws of that country, that it was at first a body which not only accused, but which also tried public offenders. However this may have been in its origin, it was at the time of the settlement of this country an informing and accusing tribunal only, without whose previous action no person charged with a felony could, except in certain special cases, be put upon his trial."

If it had been the intention of Justice Field to overturn the rule laid down in Blackstone and announced by Chief Justice McKean and Chief Justice Taney and numerous other federal judges, with reference to the taking of the testimony of the person accused and witnesses on his behalf before the grand jury, he would certainly have said so. The most that can be said is that he states that the quantum of evidence necessary to justify an indictment should be such as, unexplained and uncontradicted, would warrant a conviction by a petit jury, as against the rule that they would be warranted in returning an indictment upon testimony sufficient to render the truth of the charge probable. He recognized the fact that the grand jury had been in early times the trial as well as the accusing body, and he stated that it had come to be an accusing body only. That such was the interpretation given to the instruction clearly appears from the opinion of United States District Judge Hoffman, who, in the same district, in 1889, in the case of United States v. Terry (D. C.) 39 Fed. 355, said:

"It is enough to say that an accused person has no right to appear in person or by counsel before a grand jury, or to have witnesses in his behalf produced and examined."

To say that one has the same right to enjoy immunity from indictment, if not guilty, as he has a right to enjoy immunity from conviction, if not guilty, is to beg the question. The point to be determined is whether the individual is or is not guilty of a certain charge. The law has provided a certain method by which this is to be ascertained. There must be, first, an inquiry by a grand jury to determine whether or not the facts are sufficient to put the individual on trial on the particular charge. If indictment is returned, he is then tried upon that charge. If his guilt must be determined before indictment, the individual is in the attitude of saying to the prosecuting officers and to the court: "I must be found guilty before I can be indicted and, under the Constitution of the United States, I cannot be found guilty until I am indicted." The whole argument thus resolves itself into an absurdity.

In the course of their argument, counsel for petitioners referred to the proceedings before the grand jury as being in the nature of, or

209 F.—44

similar to, Star Chamber proceedings. To make such a comparison is to disregard the facts of history. The Star Chamber was an ancient court of criminal jurisdiction, which sat without intervention of a jury. It was an instrument of oppression in the hands of the Tudor kings, and was abolished during the period of the Stuarts. So far from being assimilated in any manner to the Star Chamber, the object, purpose, and effect of the grand jury are directly opposed to Star Chamber methods. There is only one element of similarity between the two, and that is secrecy. The Star Chamber convicted after having made secret investigation, or at least without having granted to the defendant public trial. The grand jury makes its investigation secretly, but it makes its accusations openly. Unlike the action of the Star Chamber, the action of the grand jury deprives the accused of no right without a public hearing. There can be no convictions by the grand jury. But, in guarding against Star Chamber convictions, it was not intended to go to the opposite extreme and authorize Star Chamber acquittals. The latter would be just as reprehensible as the former. If the grand jury could, in secret session, hear both sides of the case and be authorized, upon such hearing, to declare the individual whose acts were under investigation, acquitted of the charge, we would, to that extent, have a restoration of the Star Chamber. The grand jury would be discredited and would fall into disrepute. To grant this petition would tend to bring about the very situation against which counsel inveigh.

The statement was also made by counsel for petitioners in support of this request for the admission of the parties under investigation, and their witnesses, to the grand jury room to testify, in order to avoid the return of an indictment, that suspicion remains even after acquittal by the trial jury. I do not concede that statement, as a general rule. It may be, and doubtless is, true in some cases. In any case in which it is true, it is so on account of the facts in evidence and not on account of the fact of a trial. Conceding that such a result may follow from an acquittal secured from a jury after a trial in open court with all the publicity attending such trial, how much more suspicion will attach to an acquittal or exoneration at the hands of a body whose investigations are made behind closed doors and whose members are sworn to secrecy? The institution of the grand jury had attained such a place in the administration of the criminal law as to induce the people of the nation to require its recognition by amendment to the Constitution. If it is to maintain its place in the estimation of the people, it must be governed by the well-settled rules of law which have been found suited to its efficient operation. I can conceive of no more effective way to discredit the grand jury as an institution than to confer on it the power to determine questions of fact as a trial jury. That method of procedure which now serves a good purpose and merits no adverse criticism would provoke distrust and destroy confidence if observed in passing on disputed facts. The only safe course to pursue is to adhere to the practice developed throughout a long period of time and justified by experience.

The petition will be denied.